CHESTER R. HIBBARD
AND
STANLEY R. CURTIS
*vs.*
ROBERT G. FROMKIN WOOLEN CORPORATION

Somerset.    Opinion, October 20, 1960.

*Merrill & Merrill,* for plaintiff.
*Richard J. Dubord,* for defendant.

434

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ. DUBORD, J., did not sit.

WEBBER, J. This was a real action brought for the recovery of certain land on Mill Island so-called in Fairfield. The defendant disclaimed as to a portion of the demanded premises but defended as to the remainder, asserting its own title thereto and attacking the plaintiffs' claim of ownership. The dispute was primarily over the projection of plaintiffs' lot in a northerly direction and specifically the location of plaintiffs' northerly bound. A jury found for the plaintiffs and under proper instructions by special finding in the verdict in effect adopted the plaintiffs' location of the north line.

Certain exceptions taken by the defendant to rulings on the admission of evidence have now been waived. An exception to the refusal of the presiding justice to give a requested instruction which would have eliminated any issue of adverse possession from jury consideration, an exception to his refusal to direct a verdict for the defendant, and a general motion for a new trial raise the issues for determination here.

Plaintiffs' immediate predecessor in title, one Bradbury, now deceased, entered into possession of the demanded premises in 1914 under a deed which described the northerly bound of the lot as "the south line of the original Nahum Totman lot on Mill Island (south of the F. J. Savage lot)." There were in fact two lots to which Nahum Totman had previously held title and in both of which he had acquired an interest on the same day, one north and one south of the Savage lot. The jury could properly find on the basis of credible evidence and reasonable inferences to be drawn therefrom that whether Bradbury had treated the description of his northerly bound as erroneous or whether he disregarded it entirely, he did in fact occupy and claim

title to land extending northerly to the southerly line of the Totman lot *north* of the Savage lot; that for a period of more than twenty years he maintained the type of possession calculated to satisfy the legal requirements of title by adverse user; and that thereby he made his title good against the world. There was evidence that Bradbury maintained certain small buildings on the premises in connection with a plumbing business; that he gave consent to one Bessey to occupy a small camp and a garden in the northerly portion; that he kept the bushes cut on much of the area; and that he pointed out his northerly line to a witness at the location now identified as the south line of the north Totman lot. The jury could properly conclude that here there was more than the mere occasional acts of trespass found insufficient in *Webber* v. *McAvoy,* 117 Me. 326; *Stewart* v. *Small,* 119 Me. 269; and *Webber* v. *Barker,* 121 Me. 259. In such cases as these the court has shown a natural reluctance to permit relatively furtive and secret encroachments on large woodland areas to ripen into title. Certainly no such considerations have application where, as here, the premises comprising cleared land were in proximity to a populous community and every act of occupancy was obvious and apparent. The possession which will ripen into title must be actual, open, notorious, hostile, under claim of right, continuous, and exclusive for a period of at least twenty years. *Shannon* v. *Baker,* 145 Me. 58. The nature of the possession must be such as to give implied notice to the true owner who thereafter is presumed to acquiesce in the claim of the intruder. The overt acts must be such as to leave no question as to the intention to oust the owner from possession and ownership. *Roberts* v. *Richards,* 84 Me. 1, 10. We think that the acts shown to have been done in the instant case supported a jury finding that all of the foregoing requirements for title acquisition by adverse possession were fully satisfied. Here was a relatively narrow piece of land lying between the street and the stream, slop-

ing toward the water and having a natural tendency to be wet at certain seasons. The acts of dominion openly performed upon the property were such as would ordinarily be performed by a true owner on premises of this character. See *Clancey* v. *Houdlette,* 39 Me. 451, 457; *Batchelder* v. *Robbins,* 95 Me. 59, 68; and rule stated in 1 Am. Jur. 866, Sec. 131.

In 1942, Bradbury conveyed a lot to the plaintiffs in which he described the north bound as the "south line of the original Nahum Totman lot on Mill Island." Quite significantly, we think, he omitted the words "south of the F. J. Savage lot" which had appeared in his own deed from one Smith, even though he gave the Smith deed as the source of his title. The jury could reasonably infer that Bradbury purposely omitted this limiting phrase believing that it incorrectly described his north line and was in fact an error in both the Smith deed and in the deed to Smith from his grantor in which the lot was first described. In any event, Bradbury accurately described the north line to which he had claimed and occupied for more than twenty years. The jury could also properly conclude on the basis of direct evidence and reasonable inferences therefrom that an error had in fact occurred in the two prior deeds if they first found, as they must have done, that the south Totman lot was bounded by Island Avenue and lay entirely to the east of it, whereas the north Totman lot projected to the west across the street and to the shore of the mill pond. If that were true, as one proceeded northerly along the west side of Island Avenue, the *only* line of a Totman lot which one would encounter would be the south line of the *north* Totman lot. The jury could justifiably conclude therefore that since the south Totman lot nowhere touched the premises, the intended monument to establish the north line must have been the north Totman lot. It is true that Bradbury set forth at the end of the description in his deed to plain-

tiffs: "This is *the same property* that was acquired by the grantor from Arthur D. Smith, as aforesaid, except that the grantor, within a year or two, sold to American Woolen Company a strip along the southerly side thereof." (Emphasis supplied.) Bearing in mind that the Smith deed contained the limiting phrase "south of the F. J. Savage lot" above referred to, the jury in ascertaining the intention of Bradbury and the plaintiffs was faced with the necessity of reconciling a seeming inconsistency. In so doing they were guided by careful instructions of the presiding justice based on rules of law enunciated in *Abbott* v. *Abbott,* 53 Me. 356. At page 360, the court said:

> "In construing a deed, the intention of the parties, if ascertainable, should in all cases govern. * * * The rules of construction * * * seem to be well established. When several particulars are named descriptive of the land intended to be conveyed in a deed, if some are false and inconsistent, the true are sufficient to designate the land, and those which are false and inconsistent will be rejected. * * * A clear general description of the property is not controlled by any subsequent expression of doubtful import in respect to any particular. * * * Erroneous or defective reference to the sources of title will not be permitted to vary a prior description, clearly and definitely given. * * * Where the description consists of several parts, it may prove, upon comparing the description with the land itself, that some of the particulars are incorrect, mistaken or false. 'In such case * * * the law is well settled that, if it can be ascertained from such parts of the description as are found correct what was intended to be conveyed, the instrument will be effectual, the property will pass, and the incorrect parts of the description will be merely rejected and disregarded. The authorities on this are very numerous and uniform.' If, in the description of the land intended to be conveyed by a deed, any part of the description is false or mistaken, it will be rejected. * * * So if there is a con-

tradiction in the description, that part of it is to be taken which gives most permanence and certainty to the location."

See also *McCausland* v. *York,* 133 Me. 115, 124.

Applying these rules, the jury obviously concluded that Bradbury conveyed to the plaintiffs land extending northerly to the south line of the north Nahum Totman lot, these premises being all that he had acquired by adverse possession (save only the American Woolen Company lot not involved in this controversy). The physical location of that north line on the face of the earth is not in dispute.

As to any claim of the defendant that it had itself acquired title to the demanded premises by adverse possession, it is enough to say that the jury could find that the alleged acts of possession were not continued for the required period of twenty years. Insofar as the plaintiffs' theory of acquisition of the demanded premises by the adverse possession of their grantor depended upon a showing that much, if not all, of this land here in dispute has been formed by accretion and did not physically exist in 1888 and prior thereto when the island was first subdivided, the evidence and reasonable inferences therefrom were adequate to support such a finding.

In 1937, a predecessor of the defendant erected a storehouse on a portion of the demanded premises. As to whether the entry was then in the nature of a trespass or under some license from Bradbury the evidence does not disclose. The defendant now contends that Bradbury, and subsequently the plaintiffs, could not silently acquiesce in such user without thereafter being equitably estopped to assert claim of title. In support of this position the defendant cites *Martin* v. *Railroad,* 83 Me. 100. It must be borne in mind that the whole concept of prescriptive title rests on a theory of notice express or implied and implied acquiescence for a pe-

riod of twenty years. Any doctrine of estoppel which has the practical effect of preventing one from asserting his own title after the lapse of a much shorter period must, as *Martin* carefully points out, be "carefully and sparingly applied" and then only where actual fraud is shown or fault and negligence or a dishonest silence equivalent to fraud. In *Martin,* for example, the plaintiff actively misrepresented his own title as being in another and the defendant proceeded in reliance on that misrepresentation. The defendant entered as grantee under a deed from the very party represented by plaintiff as having the title. The court noted that the facts must be and were peculiarly within the knowledge of the party estopped. This requisite element of proof was again emphasized in *Card* v. *Nickerson,* 150 Me. 89. At page 95, the court said:

> "In order to create an estoppel, the conduct, misrepresentations, or silence of the person claimed to be estopped must be made to or in the presence of a person who had no knowledge of the true state of facts, *and who did not have the same means of ascertaining the truth as did the other party."* (Emphasis ours.)

In the instant case the defendant's predecessor knew or should have known itself to be without any color of title to land west of Island Avenue, and all other facts relating to the true title were as available to it as to anyone. Although the exact circumstances are not shown, the storehouse seems to have been erected in disregard of the rights of the true owner, whoever he might prove to be. We do not reach the interesting question as to whether or under what circumstances a bona fide purchaser relying on the title of his grantor could be estopped by conduct of his grantor of which he had no knowledge. See *Proctor* v. *Libby,* 110 Me. 39, 44. In our view, the evidence in this case was wholly

insufficient to warrant any application of the doctrine as against these plaintiffs.

The entry will be

*Exceptions overruled.*
*Motion for new trial denied.*